UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GOOD TECHNOLOGY CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | No. 3:11-cv-02373-M |
| LITTLE RED WAGON | § | |
| TECHNOLOGIES, INC., (f/k/a LRW | § | |
| DIGITAL, INC. and LRW DIGITAL INC.) | § | |
| d/b/a LRW TECHNOLOGIES, INC. and LRW | § | |
| DIGITAL, INC., and FIXMO U.S., INC. | § | |
| | § | |
| Defendants. | § | |

## CLAIM CONSTRUCTION ORDER AND MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiff Good Technology Corporation ("Plaintiff")[1] brings this suit against Defendants

Little Red Wagon Technologies, Inc. (f/k/a LRW Digital, Inc. and LRW Digital Inc.) d/b/a LRW

Technologies, Inc. and LRW Digital, Inc. ("LRW") and Fixmo U.S., Inc. ("Fixmo") (collectively

"Defendants"). The parties seek construction of disputed terms used in the following patents:

U.S. Patent Numbers 7,039,679 ("the '679 patent"), 6,023,708 ("the '708 patent"), 6,085,192

("the '192 patent"), 6,708,221 ("the '221 patent"), 6,151,606 ("the '606 patent"), and 7,039,679

("the '679 patent"). Before the Court are terms found in claim 1 of the '679 patent, claims 52, 56

and 89 of the '708 patent, claims 10 and 22 of the '192 patent, claims 15 and 16 of the '221

patent, and claims 21 and 25 of the '606 patent. The United States Patent and Trademark Office,

the PTO, has reexamined and confirmed all five patents. A number of the disputed claims and

---

[1] Plaintiff changed its name from Visto Corporation to Good Technology Corporation during the
pendency of this litigation. The Court occasionally addresses Plaintiff as Visto when referring to
the company's pre-suit activities.

terms have been construed in seven district court opinions, six from the Eastern District of Texas.[2]  This Court held a claim construction hearing on January 28, 2013.

## II.  DESCRIPTION OF THE TECHNOLOGY

The five patents-in-suit are related and are directed to systems and methods for synchronizing data across computer networks.  The '192 patent addresses the problem of data inconsistency by providing "a system and method for synchronizing multiple copies of a workspace element"—which can include elements of e-mail data, file data, calendar data, and user data—"in a secure network environment." '192 col.1 ll.30–54. The system includes a general synchronization module that operates on a base system on a computer protected by a firewall, known as the client site.  '192 C1 col.4 ll.35–3.  The general synchronization module on the client site cooperates with a synchronization agent operating outside the firewall to examine and compare versions of a workspace element stored within and outside of the firewall.  The system further contains means for generating a preferred version of the workspace element and synchronizing the versions at the two different storage locations.

The '221 patent describes a global server, protected by a global firewall, that facilitates the workspace data synchronization between the client site on a local area network ("LAN") server secured by a LAN firewall and a remote smart phone.  '221 col.2 ll.42–44; '221 C1 col.1 ll.1–60.  The '679 patent similarly uses a global server to synchronize data between a LAN and a

---

[2] These opinions include: *Visto Corp. v. Seven Networks, Inc.* ("*Seven*"), No. 2:03-CV-333-TJW (E.D. Tex. April 20, 2005) (Ward, J.); *Visto Corp. v. Seven Networks, Inc.* ("*Seven II*"), No. 2:03-CV-333-TJW (E.D. Tex. April 18, 2006) (Ward, J.); *Visto Corp. v. Sproqit Tech., Inc.* ("*Sproqit*"), No. C-04-0651 EMC (N.D. Cal. Aug. 4, 2006) (Chen, Mag.); *Visto Corp. v. Smartner* ("*Smartner*"), No. 2:05-CV-91 (E.D. Tex. Dec. 29, 2006) (Ward, J.); *Visto Corp. v. Microsoft* ("*Microsoft*"), No. 2:05-CV-546 (E.D. Tex. Aug. 28, 2007) (Folsom, J.); *Visto Corp. v. Good Tech., Inc.* ("*Good*"), No. 2:06-CV-039 (E.D. Tex. Jan. 16, 2008) (Everingham IV, Mag.); and *Visto Corp. v. Research in Motion Ltd.* ("*RIM*"), No. 2:06-CV-181 (E.D. Tex. April 30, 2008) (Everingham IV, Mag.).

"plurality of smart-phone devices." '679 B2 col.17 ll.13–17.  The '679 patent specifically targets the synchronization of e-mail data.  *Id.*

The '708 patent introduces a "global translator," which cooperates with the rest of the synchronization system to translate between versions of workspace elements in different formats. '708 col.1 l.69—col.2 l.40.  The format translation enables the system to synchronize workspace elements between "different application programs and different platforms."  '708 col.1 ll.32–34. Translation may be necessary when the user attempts to synchronize data in Format A, *e.g.*, bookmarks from the Netscape Navigator web browser, with data in Format B, *e.g.*, bookmarks from the Internet Explorer web browser. '708 col.3 ll.33–51.

The '679 patent addresses security concerns raised when a remote user initiates communications from an untrusted computer.  The system includes methods for "automatically disabling the untrusted client site from accessing at least a portion of the downloaded data after a user has finished using the data in a trusted manner." '679 C1 col.2 ll.62–64.

### III. LEGAL STANDARD

A.  General Principles of Claim Construction

Claim construction is a question of law exclusively for the court.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 971–72 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (citations omitted).  Accordingly, the correct construction will be the one that "stays true to the claim language and most naturally aligns with the patent's description of the invention." *Id.* (internal citations omitted).

In construing disputed terms, a court looks first to the claim language, for "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Id.* at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  Generally, the words of a claim should be given their "ordinary and customary meaning," which is "the meaning that the term[s] would have to a person of ordinary skill in the art in question at the time of the invention."  *Id.* at 1312–13.

In many cases, the meaning of a term to a person skilled in the art will not be immediately apparent, and a court must turn to other sources to determine the term's meaning. *See Phillips*, 415 F.3d at 1314.  "Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Id.* at 1314 (citations omitted).

Courts should also consider the context in which the term is used in an asserted claim or in related claims in the patent, bearing in mind that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id.* at 1313.  Indeed, the specification "is always highly relevant to the claim construction analysis" and "[u]sually . . . dispositive; it is the single best guide to the meaning of a disputed term."  *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Where the specification reveals that the patentee has given a special definition to a claim term that differs from the meaning it would ordinarily possess, "the inventor's lexicography governs." *Id.* at 1316.  Likewise, where the specification reveals an intentional disclaimer or disavowal of

claim scope by the inventor, the inventor's intention, as revealed through the specification, is dispositive.  *Id.*  Nevertheless, the claims are not necessarily limited to the disclosed embodiments.  *Phillips*, 415 F.3d at 1323.  The patent's prosecution history is also relevant to the extent it "demonstrat[es] how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution."  *Id.* at 1317 (citing *Vitronics*, 90 F.3d at 1582–83).

Finally, courts may consider extrinsic evidence such as "expert and inventor testimony, dictionaries, and learned treatises." *Id.* (citing *Markman*, 52 F.3d at 980).  Such evidence, however, is "less reliable than the patent and its prosecution history in determining how to read claim terms," and is therefore "less significant than the intrinsic record."  *Id.* at 1317–18 (citations omitted).

B.  Means-Plus-Function Claims

A patentee may claim an element of the invention in terms of the element's function, without reciting corresponding structure in the claim itself.  35 U.S.C. § 112, ¶ 6.  However, a claimed function is valid only if the specifications "set forth . . . adequate disclosure showing what is meant by the language."  *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008) (quotation omitted).

Construction of a means-plus-function limitation requires the court to (a) determine the claimed function and (b) "identify the corresponding structure in the written description of the patent that performs the function."  *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012).  "A structure disclosed in the specification qualifies as a 'corresponding structure' if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim."  *Id.*  (citation omitted).

Where the claim involves a computer-implemented means-plus-function limitation, the specification must disclose more than a general purpose computer; it must disclose an algorithm for performing the claimed function. *See id.* at 1312. That algorithm can be expressed "as a mathematical formula, in prose, as a flow chart," or in any other manner that makes the corresponding structure clear to a person of ordinary skill. *Id.* at 1312–13. "When the specification discloses an algorithm that only accomplishes one of multiple identifiable functions performed by a means-plus-function limitation, the specification is treated as if it disclosed no algorithm." *Id.* at 1319.

IV. DISCUSSION AND CONSTRUCTION

A.  <u>Weight of Previous Decisions</u>

This Court is not obliged to endorse the constructions adopted in any of the previous district court opinions construing the patents-in-suit. In *Markman*, the Supreme Court touted the "importance of uniformity in the treatment of a given patent" as one of the justifications for entrusting claim construction to courts, not juries. 517 U.S. at 390. The Court went on to explain, however, that "treating interpretive issues as purely legal will promote (though it will not guarantee) *intrajurisdictional certainty* through the application of stare decisis." *Id.* at 39 (emphasis added). As none of the decisions originate in this district, intrajurisdictional stare decisis does not apply. Although mindful of the importance of uniformity, the Court renders an independent claim construction, turning to the prior constructions only insofar as the Court finds them persuasive.

B.  Claim Terms

1.  **"global server"** – '221: 15; '679: 1

Court's Construction: *"a server accessible from remote locations which stores independently modifiable copies of selected portions of workspace data"*

Evidence Authority: Defendants attempt to impose three limitations on the global server. Specifically, Defendants claim the global server must (1) be located on the Internet, (2) remote from both the first device and the smartphone—rather than merely accessible from a remote location—and (3) store copies of workspace data that can be modified *at the global server*.

As a threshold matter, the Court addresses what Defendants have labeled the "coined term" doctrine.  Relying on *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004), Defendants argue that where a disputed term lacks an accepted meaning in the art, it should be construed only as broadly as provided for by the patent itself.  From this, Defendants urge the Court to accord particular weight to the limitations found in the patent specifications.  But *Irdeto* does not stand for the proposition that when a term lacks an accepted meaning in the art, all the specification limitations pertaining to that term necessarily restrict the claims.  Instead, the *Irdeto* court outlined the limited circumstances in which "the specification may define claim terms by implication." *Id.*  Importing the specification limitations is appropriate only where (1) the patentee "admitted the claim term lacked an ordinary meaning," (2) and "unequivocally directed the patent examiner and the public to the specification as a complete source of meaning for the disputed term," and (3) the patent "repeatedly, consistently, and exclusively" used the term in a specific, limited manner. *Id.* at 1302–03.  With this in mind, the Court turns to the three urged limitations on the term global server.

The global server need not be on the Internet.  Even assuming that the term global server

lacks an ordinary meaning in the art, the specifications do not "repeatedly, consistently, and exclusively" describe the global server in such a way as to require it to be on the Internet. *See id.* Indeed, the Summary of the Present Invention of the '221 patent explains that a "user can gain access to a global server using any terminal which is connected via a computer network *such as the Internet* to a global server." '221 col.2 ll.45–47 (emphasis added). This description makes clear that the Internet is only one example of a computer network connecting to a global server. In *In re Abbott Diabetes Care, Inc.*, the Federal Circuit explained that *Irdeto* could be distinguished where the patent specifications listed a limitation as only an *example* of a possible embodiment. 696 F.3d 1142, 1150 (Fed. Cir. 2012). Describing the limitation as an example would constitute an "explicit acknowledgment that at least some embodiments" of the invention did not embrace the limitation. *Id.*

Examining the '221 patent and '679 patent in concert further demonstrates the impropriety of the urged Internet limitation. While claims 15 and 16 of the '221 patent are silent as to an Internet connection requirement, claim 1 of the '679 patent claims a global server with an Internet connection. '679 B2 col.17 ll.19–27 (the system includes "a global server[,] . . . a first Internet communication channel coupling said LAN server to said global server[,] . . . [and] a plurality of second Internet communication channels each coupling said global server to a respective one of said smart-phone devices"). To import the Internet connection limitation onto the term global server in both patents would render superfluous the Internet requirements in claim 1 of the '679 patent. Courts are to avoid such interpretations. *See, e.g.*, *In re Suitco Surface*, 603 F.3d 1255 (Fed. Cir. 2010); *Pass & Seymour, Inc. v. International Trade Comm'n*, 617 F.3d 1319 (Fed. Cir. 2010).

Defendants' proffered remote restriction is also unwarranted. The claims and the

specifications make clear, and Plaintiff agrees, that the global server must be accessible from remote locations. But it does not follow that the global server is necessarily "remote" from the first device and the smartphone. During reexamination of the '221 patent, the inventor clarified that the global server is a separate claim element that is not interchangeable with either the first device or the second device. *Defs.' Opening App.*, Ex. 4G. Context clarifies that the statement merely says that the global server is distinct from the first and second device, not that it must be remote from them. Moreover, in those instances where the patent requires that the global server and first device be separated by a firewall, the claims make that requirement clear. *See* '221 C1 col.1 ll.54–60 ("the first device is located within . . . a LAN firewall, the second device is outside the protection of the LAN firewall, [and] the global server is outside the protection of the LAN firewall"). The patents do not otherwise justify a construction of global server that requires remoteness from the first device and the smartphone. Instead, as Judge Ward concluded in *Seven*, the patents require only that the global server be accessible from remote locations.

Finally, the claims do not require that the copies be capable of modification *at the global server*. Judge Ward's reasoning in *Seven* does not support the construction Defendants urge. After determining that the global server stores independently modifiable copies, Judge Ward in *Seven* noted that the base system and synchronization agent on the global server "synchronize the selected portions of the first set of workspace data stored on the client and the *second set of workspace data stored on the global server*." *Seven*, slip op. at 23 (citing '221 col.3 ll.10–14) (emphasis in original). Judge Ward invoked the specification language as additional support for his conclusion that the global server stores data, but not, as Defendants argue, to state or suggest that "the fact that the synchronization agent operates on the global server to determine whether modifications have been made to the workspace data stored there indicates that the modifications

can be made on the independently modifiable copy stored on the server itself." *Defs.' Opening Br.* 32.  Storing, comparing, and modifying are three separate functions.  The global server can store and compare copies; it does not follow that the copies must be capable of modification there.

2.  **"communication(s) channel"** – '192: 10, 22; '708: 52, 56; '679: 1

Court's Construction: *no construction*

Evidence and Authority: The central dispute is whether the patents require that the communication channel be established by an outbound connection originating from behind the firewall.  It does not.

The Court's analysis begins with the language of the claims themselves, which do not recite a communication channel established by an outbound connection.  Neither do the specifications uniformly depict communication channels established by outbound connections.  All three patents describe communication channels without imposing a directionality requirement: "the communications module" on a base system behind a corporate firewall "and the communications module" on a global server behind a global firewall "establish a communication channel" between the global server and the base system.  '192 col.7 ll.5–8; '708 col.9 ll.23–25; '679 B2 col.15 ll.12–14.  Indeed, on a number of occasions, the specifications disclose embodiments of the invention in which communications are established via *inbound* communications.  For example, both the '192 and '708 patents teach that the "communications module **505**"—which is on the global server—may "include routines for establishing a secure communications channel through the global firewall . . .  and through the corporate firewall."  '192, col.6 ll.35–41; '708 col.8 ll.24–31.  Presumably, when the communications module on the global server is the one establishing a communication channel, it does so by sending an inbound

communication to the base system.

Defendants argue that the communication channel language is constrained by an outbound connection requirement because the patentee characterized the outbound connection model as the solution to the "key problem" addressed by the invention. This argument is misplaced. Both in the specifications and in the prosecution, the patentee explained that one of the problems addressed by the invention was that typical corporate firewalls blocked inbound connections, thereby complicating an effort to synchronize data with a remote site. The solution, as articulated in the Summaries of Invention of the three implicated patents, was to initiate *synchronization* from within the firewall. '192 col.2 ll.45–48; '708 col.2 ll.33–36; '679 col.45 ll.29–33. ("[B]ecause synchronization is initiated from within the firewall, the typical firewall which prevents inbound communications does not act as an impediment to a workspace element synchronization."). Nevertheless, of all the claims reciting a communication channel, only claim 22 of the '192 patent requires that actions—generating first and second examination results— initiate from within the firewall. This suggests that when the inventor intended to so limit the claims, he did so, and counsels against reading the dictionary limitation into all communication channel phrases. This Court is also mindful of the Federal Circuit's admonition to avoid importing specification limitations onto the claims absent a clear intention by the patentee to do so, even if the patent discloses no embodiments without the limitation. But perhaps more importantly, the outbound connection restriction touted in the specifications applies to *initiating synchronization*, not necessarily to *establishing a communication channel*.

Both the '192 and '708 patents teach that, at least in the preferred embodiment, the communications that begin the synchronization process originate from within the LAN. Synchronization begins when the synchronization start module on the base system instructs the

general synchronization module, also on the base system, to begin execution of its routines, which include: receiving modified version information from the synchronization agent on the global server, examining and comparing the various versions of a workspace element, and performing an appropriate synchronizing responsive action.  '708 col.7 ll.14–35.  The "communication with the synchronization agent [on the global server], preferably initiates from within the LAN **10**, because the typical firewall **114** prevents in-bound communications and allows out-bound communications."  '708 col.7 ll.14–35.  But the fact that the *communication* with the synchronization agent on the global server preferably initiates through an outbound connection does not suggest that the *communication channel* must be established in the same way.  Indeed, as noted above, both the '708 and '192 patents teach that the communications module on the global server can be charged with establishing a communication channel with the base site, presumably through an *inbound* connection.  In other words, initiating synchronization and establishing a communication channel are different functions.  That the specifications recite synchronization *preferably* initiating via an outbound connection does not establish a clear intention to similarly constrain the establishment of the communication channel.

Finally, the Court's interpretation of how a person of ordinary skill in the art would interpret the plain meaning of the term "communication channel" is buttressed by a technical dictionary published in 2002, which defines communication channel simply as a "medium for transferring information," without any reference to how the channel must be established. MICROSOFT COMPUTER DICTIONARY, 5th ed., 94, 113 (2002).  Accordingly, and for the reasons listed above, the Court rejects the outbound connection limitation, and finding the term communication channel sufficiently clear, declines to construe it.

### 3. "synchronization agent" – '192: 10

Court's Construction: *"software routines or code that send at least a portion of second version information to a general synchronization module for purposes of synchronization"*

Evidence and Authority: The only dispute is whether the patent mandates that the synchronization agent be located at the global server. It does not. The doctrine of claim differentiation compels a narrower construction. "[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005). The presumption may be overcome, but only by intrinsic evidence that justifies a more restricted interpretation. *SanDisk Corp. v. Kingston Tech. Co., Inc.*, 695 F.3d 1348, 1361 (Fed. Cir. 2012).

Here, independent claim 10 of the '192 patent claims a "system comprising . . . a synchronization agent for operating outside the first firewall." '192 C1 col.4 ll.33, 39–40. Dependent claim 12, which was cancelled during the second reexamination, described the "system of claim **10** wherein the synchronization agent and the second store are on a global server which is protected by a global firewall." '192 col.9 ll.16–17. Because the limitation— that the synchronization agent be on the global server—is present in dependent claim 12, but not in independent claim 10, the Court begins with a presumption that the limitation does not apply to claim 10. *See Phillips*, 415 F.3d at 1315.

Defendants argue that the claim differentiation doctrine does not apply because (1) dependent claim 12 was cancelled and (2) that claim added more than one requirement not found in independent claim 10. First, Defendants cite no authority, and the Court is aware of none, holding that the cancellation of a claim negates the claim differentiation doctrine. Absent evidence that the PTO cancelled the dependent claim because it did not add anything to the

independent claim, the Court concludes the original claim structure offers guidance as to how the inventor understood his patent, and how it would be understood by someone with ordinary skill in the art.  *See PSN Illinois, LLC v. Ivoclar Vivadent, Inc.*, 525 F.3d 1159, 1166 (Fed. Cir. 2008) ("[C]ancelled claims may provide probative evidence" during claim construction).  Second, it is true that "the doctrine of claim differentiation is at its strongest" when "the sole difference between the independent claim and the dependent claims is the limitation that one party is trying to read into the independent claim."  *SanDisk Corp.*, 695 F.3d at 1361.  Arguably, dependent claim 12 adds three requirements not found in independent claim 10: that the synchronization agent be on the global server, that the second store[3] be on the global server, and that the global server be protected by a global firewall.  But even if the claim differentiation doctrine is not at its strongest here, it still establishes a presumption against Defendants' proposed limitation.

Nothing in the intrinsic record overcomes that presumption.  Defendants note that the specifications describe "a synchronization agent *at the global server*" as part of the "present invention." '192 col.1 ll.52, 64–65 (emphasis added).  But elsewhere, in the description of the preferred embodiment, the specifications clarify that the synchronization agent is "*preferably*" stored "on the global server."  '192 col.3 ll.44–46 (emphasis added).  In other words, storing the synchronization agent at the global server is an optional feature.  As detailed in section IV.B.6., *infra*, the Federal Circuit explained in *Absolute Software* that when features are described as part of the "present invention," but also as optional, they do not limit the claims themselves. *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1137 (Fed. Cir. 2011).  Thus, the Court declines to import the geographic, global server limitation to claim 10, and instead adopts the construction of "synchronization agent" used in *Seven*.

---

[3] As explained in Section IV.B.12, *infra*, the Court construes the term store as "a storage location for data."

### 4. Means-plus-functions claims

**a. "means for generating a preferred version from the first workspace element and from the copy by comparing the first version information and the second version information, wherein if only one of the first workspace element and the copy has been modified, then the means for generating selects the one as the preferred version"** – '192: 10

Agreed Function: *"generating a preferred version from the first workspace element and from the copy by comparing the first version information and the second version information, wherein if only one of the first workspace element and the copy has been modified, then the means for generating selects the one as the preferred version"*

Corresponding Structure: *general synchronization module 425*

Evidence and Authority:  The core question here is whether the patent specification discloses a sufficiently detailed corresponding structure to perform the claimed function.  Plaintiff identifies general synchronization module 425 as the corresponding structure.  Defendants argue that the specification descriptions of general synchronization module 425 do not amount to an algorithm, and that even if they did, they do not describe a structure capable of performing the entire function.

Generally speaking, there are two functions embedded in this claim: (1) comparing the first and second version information, and (2) generating a preferred version.  The specification descriptions of general synchronization module 425 embody an algorithm for both functions:

> The general synchronization module **425** includes routines for requesting version information **124** from the synchronization agent **126** (FIG. 1) and routines for comparing the version information **255** against a last synchronization signature **435** such as a last synchronization date and time to determine which versions have been modified. The general synchronization module **425** further includes routines for comparing the version information **124** and the version information **255** to determine if only one or both versions of a particular workspace element have been modified and routines for performing an appropriate synchronizing responsive action.

'192 col.5 ll.50–61.  As described above, and seen in Figure 1, the general synchronization

module 425 is located on the base station, behind the corporate firewall.  It requests version information from the synchronization agent 126, which, in the preferred embodiment, is located on the global server, outside of the firewall.  It also has routines for comparing version information 124 (located outside of the firewall) with version information 255 (located on the date storage device 230, inside the firewall).  Thus, it compares the first and second version information.

Defendants suggest that the second version information must be located on the remote terminal, and that, because general synchronization module 425 does not communicate directly with the remote terminal, it cannot compare the two versions of information.  But neither the claims nor the specifications require that the second version information referenced in claim 10 be located on the remote terminal.  Indeed, it appears that, at least in the preferred embodiment, that second version information is located *on the global server.  See* '192 Fig. 1 (displaying Version Information 124 on the global server).[4]

The specifications also explain that the general synchronization module 425 includes routines for determining if either version has been modified, and for performing an appropriate synchronizing responsive action.  The responsive action could include (1) "forwarding the modified version (as the preferred version)," or (2) "instructing content-synchronization module **430**" to create a preferred version by reconciling two or more modified versions according to

---

[4] Elsewhere, the claim approaches, but falls short, of requiring that the second version information be located on the second store on a smart phone.  Claim 10 claims a synchronization agent that operates outside the first firewall and that "forward[s]" second version information to the general synchronization module.  '192 C1 col.4 ll.39–41. The second version information clearly relates to the smart phone in that it indicates whether a "copy of the first workspace element at a second store on a smart phone has been modified."  '192 C1 col.4 ll.41–44.  Moreover, that the synchronization agent "forward[s]" the version information suggests that it is stored somewhere else, ostensibly in the second store on the smart phone.  But the term "forward" does not preclude an embodiment in which the second version information is stored elsewhere on the global server, as it appears in Figure 1.

user preference or based on preset preferences.  '192 col.5 l.60–col.6 l.27.  Thus, general

synchronization module 425 includes routines for generating a preferred version.

These descriptions, coupled with the flow chart in Figure 6, explain in an easily

understandable manner the steps that general synchronization module 425 takes to compare

version information and to generate a preferred version.  Accordingly, a person of ordinary skill

in the art would understand general synchronization module 425 to correspond to the claimed

function.  *See Noah Systems*, 675 F.3d at 1312–14 (a patent adequately describes the structure

corresponding to a computer-implemented means-plus-functions limitation if it explains the steps

necessary to achieve the function in "any understandable terms").



FIG. 1

FIG. 6

**b.  "means for storing the preferred version at the first store and at the second store"** – '192: 10

<u>Agreed Function</u>: *"storing the preferred version at the first store and at the second store"*

<u>Corresponding Structure</u>: *general synchronization module 425 and a general synchronization*

*module for the second store on the smart phone*

<u>Evidence and Authority</u>:  Plaintiff presents general synchronization module 425 as the corresponding structure for this function, as it did for the means-plus-function structure analyzed above.  Defendants argue it cannot perform the entire claimed function.

Claim 10 of the '192 patent clarifies that the second store, unlike second version information, must be located on the smart phone.  '192 C1 col.4 ll.43–45 (describing "a workspace element at a second store on a smart phone").  Once a preferred version has been generated, both the general synchronization module 425 and the general synchronization module 510 (located on the global server) can "send the preferred version of the workspace element . . . to the other store."  '192 col.4 ll.33–35, 46–48.  At first blush, then, it would seem that general synchronization module 425 has the capacity to store the preferred version at the second store.  But closer examination reveals that the "second store" claimed in claim 10 does not correspond with the "other store" described in the specifications.  The specification explains what it means for general synchronization module 425 to forward to the other store:

> If the preferred version is a workspace element in the workspace data **185** [on the base system] then general synchronization module **425** sends the preferred version or the changes to general synchronization module **510** [on the global server] to update the outdated workspace element in the workspace date **123** [on the global server].

'192 col.7 ll.48–53.  This process defines what it means to "send the preferred version to the other store," and reveals that the other store is located on the global server, not on the smart phone.  This disconnect likely arose during the first reexamination when claim 10 was amended to specify that the second store was on a smart phone.  It appears that the corresponding embodiment descriptions were not updated.  But it is not this Court's job to rewrite the patent.  The specifications, as currently drafted, do not describe any method by which general synchronization module 425 can store preferred version information at the second store on a

smart phone.  The combination of Figures 1 and 4 reinforces the understanding that general synchronization module 425 communicates with the global server, but not with the remote terminal.

This is not the end of the inquiry, however, for the Court must not find a claim as indefinite if it is amenable to construction.  *See Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).  Here, the specification teaches that the remote terminal 105—the smart phone—may "include a second base system similar to the base system" on the corporate LAN that can "synchronize copies of workspace elements stored on it with workspace elements of workspace data **123** on the global server **120**."  '192 col.3 ll.60–61, col.7 l.66—col.8 l.1.  Defendants' proposed alternative corresponding structure recognizes that the remote terminal can include its own general synchronization module, and seemingly concedes that it would be able to store preferred versions on the second store.  The Court agrees.  Thus, the Court concludes that the structure corresponding to the claimed function is: general synchronization module 425 and a general synchronization module for the second store on the smart phone.

**5.   "general synchronization module"** – '192: 10; '679: 1

Court's Construction for the '192 patent: *"software routines or codes that perform the task of determining whether a workspace element and/or independently modifiable copy thereof has (or have) been modified, based on one or more criteria"*

Court's Construction for the '679 patent: *"software routines or codes that perform the task of determining whether one or more independently modifiable emails has (or have) been modified, based on one or more criteria"*

Evidence and Authority:  The question presented is whether the general synchronization module must perform an "appropriate responsive action" if it determines that a workspace element has

been modified.  The claim language itself requires that the general synchronization module

"examine[]" information, but is silent as to any responsive action requirement.

Defendants rely on *Irdeto Access* in arguing that the term general synchronization module

has no commonly accepted meaning, and should be construed no more broadly than the

specifications.  *Defs.' Opening Br.* 24–25.  But, as noted, the teachings of *Irdeto Access* apply

only when it is clear the claim term has no accepted meaning in the art, and the plaintiff has

evinced an unequivocal intent to rely on the four corners of the patent to define the term.  *Irdeto*

*Access*, 383 F.3d at 1302–03.  Neither predicate is satisfied here, and the Court finds no

justification in the claim or specification for requiring that a general synchronization module

necessarily perform an appropriate responsive action.

Defendants criticize this Court's construction, first adopted by Judge Ward in *Seven*, for

its reliance on a technical dictionary to define the root words comprising the phrase general

synchronization module.  In *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1359

(Fed. Cir. 2005), the Federal Circuit cautioned against constructions based on an amalgamation

of individual dictionary definitions, but only to the extent those definitions were inconsistent

with the patent specifications.  Defendants have not shown, and the Court does not believe, that

the construction adopted conflicts with the '192 or '679 patent specifications.

Furthermore, the dictionary definitions strengthen the conclusion that "synchronization"

can be limited to comparing "version comparison," and need not include a responsive action to

reconcile different versions.  The Microsoft Press Computer Dictionary defines "module" as a

"collection of routines that . . . performs a certain task," and "synchronization" as "version

comparisons of copies of the files to insure they contain the same data."  MICROSOFT PRESS

COMPUTER DICTIONARY, 3d ed. (1997).  Finding them to be the best reflection of how a person

of ordinary skill in the art would understand the term general synchronization module in the context of the '192 and '679 patents, the Court adopts Judge Ward's constructions from *Seven*.

**6. "translating between the first format and the second format"** – '708: 52, 56, 89

Court's Construction: *converting, at a global translator, information or data in a first format to information or data in a second format*

Evidence and Authority:  The two central disputes are whether, as Defendants contend, (a) translation must be performed by a "global translator," and (b) whether that global translator is necessarily remote from both the corporate LAN and the remote terminals.  In other words, Defendants seek to limit what can do the translating—the "global translator"—and where the translating can take place—"remote from both the first store and remote terminals."

To justify the "global" limitation, Defendants rely in part on a line of Federal Circuit cases holding that specification language qualifying the "invention" or "present invention" can be used to limit the claims themselves.  *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention"); *Honeywell Int'l, Inc. v. ITT Indus.*, Inc., 452 F.3d 1312, 1318 (Fed. Cir. 2006) (holding that descriptions repeatedly referred to as a component of "this invention" or the "present invention" were limiting, where the prosecution history did not support a broader scope).

Here, the '708 patent specification consistently refers to the "global translator" as the means for translating, and often discusses it as a feature of the "present invention."  For example, the patent is entitled "System and Method for Using *a Global Translator* to Synchronize Workspace Elements across a Network." '708 [54] (emphasis added).  In the Background, the specification provides that "*this invention* relates to . . . a system and method for using a *global*

*translator* to synchronize workspace elements across a computer network." '708 col.1 ll.19–22 (emphasis added).  Finally, in the Summary of Invention, the '708 patent claims "*the present invention* provides a system and method for using a *global translator* to synchronize multiple copies of a workspace element in a secure network environment." '708 col.1 ll.58–61 (emphasis added).

But the inquiry does not end there.  Limitations referenced as part of "the invention" or "the present invention" do not necessarily attach to the claim language where, for example, the references "are not uniform," or are unsupported by the rest of the intrinsic record.  *Absolute Software*, 659 F.3d at 1136.  In *Absolute Software*, the patent specification referred to "the present invention" as one that made a single call "during the selected period."  *Id.*  But the patent did not "uniformly refer to a one-call-per-time-period limitation as being co-extensive with the entire invention." *Id.* at 1137.  In fact, a separate portion of the specification described the limitation as an "*optional* feature[] of the present invention." *Id.*  This inconsistency induced the panel to reject the position that the limitation was a necessary restriction on the entire invention.

Similarly, in *Voda v. Cordis Corp.*, 536 F.3d 1311, 1320 (Fed. Cir. 2008), the Federal Circuit concluded that limitations described in the specifications as the "present invention" could not be imposed on the claims, where the specifications did not consistently include the limitation.  This was true even without an explicit recognition that the limitation was optional.  In *Voda*, the patent specification provided that "the contact portion of the catheter of the present invention" is "a straight portion."  Elsewhere, however, the specification referred to the contact portion of the catheter without requiring that it be straight, and arguably implying that it could be curved.  *Id.* at 1320–21.  Given the inconsistent descriptions, the Federal Circuit found the limitation described as part of the "present invention"—that the contact portion of the catheter be straight—did not

constitute a disavowal of the claim scope, and could not be imported to the claims themselves.

Here, the consistency of the references to a "global translator" align the '708 patent more closely with those analyzed in *Vonage* and *Honeywell*, rather than with those in *Absolute Software* and *Voda*. Unlike in *Absolute Software*, the '708 patent never refers to the "global translator" as an optional means of translation. Unlike in *Voda*, the '708 patent specifications do not portray the translator without the global limitation, or suggest the translator could be anything but global. Indeed, with two limited exceptions, the specifications *uniformly* describe the translator as global. *See, e.g.,* '708: [54], [57], Fig. 1, col.1 ll.21, 60, col.4 ll.13, 39, col.8 ll.48, 64, col.9 ll.56–57, 65. Even the exceptions are consistent with the global translator embodiment. Both the Abstract and the Summary of the Invention explain that "[t]he system includes . . . a translator for translating between the first format and second format." '708: [57], col. 2 ll. 3–10. The systems described in both places refer to earlier descriptions of a "system" that uses "a *global translator*" to "synchronize multiple copies of a workspace element." '708 [57], col.1 ll.59–51 (emphasis added).

In sum, the '708 patent specification recites a global translator as part of the present invention, and do not include a single non-global translator embodiment. Accordingly, and in keeping with the teachings of *Vonage* and *Honeywell*, the Court concludes that the patentee limited the translation claims such that translation necessarily occurs at a global translator.[5]

It does not follow, however, that a global translator must be located "remote from both

---

[5] Defendants also rely on a statement from the prosecution history, in which the patentee distinguished a prior art reference by describing claims 1 and 17 of the '708 patent as providing "a system and method for synchronizing two versions of a workspace element across a network using a global translator." Defendants argue this statement constitutes a "clear pronouncement about what the claims require," and should be binding. *Defs.' Resp. Br.* 6. The Court disagrees. As did Judge Ward in *Seven*, the Court finds that, in context, the statement "reflects an attempt to distinguish the . . . reference on the grounds that [it] failed to include the second store limitation contained in claims 1 and 17," and does not serve as a clear limitation on the scope of the translator. *See Seven*, slip op. at 25.

the first store and remote terminals," as Defendants suggest.  The "global" limitation is not

necessarily rendered meaningless by omitting the geographic restriction that Defendants urge.

Indeed, the specifications make clear that the global server maintains workspace data in a "global

format which is selected to be easily translatable by the global translator to and from Format A

and to and from Format B."  Thus, the "global" in "global translator" could refer to its ability to

manage the "global format," and not to a requirement that it be located on the "global server."

Regardless, the specification does not identify the location of the global translator as part of the

present invention, and the Court therefore finds no justification for imposing this description of

the preferred embodiment onto the claim itself.

   **7.  "translating" –** '697: 1

Court's Construction: *converting information or data in a first format to information or data in a*
*second format*

   **8.   "second format" –** '708: 52, 56, 89

Court's Construction: *"second format, which is different from the first format"*

Explanation and Authority: The issue here is whether the second format is a "substantively

different document format than the first, with differences extending beyond minor differences in

network or disk storage format."  Defendants claim that the patentee embraced this limitation,

verbatim, to distinguish prior art, and is therefore estopped from seeking a broader interpretation.

   Defendants' disclaimer argument springs from Visto's response to a preliminary

reexamination ruling that invalidated some claims of the '708 patent over prior art.  One piece of

prior art, Lotus Notes, had the capability to "replicate" documents in Notes format.  *Defs.'*

*Opening Br.* Ex. E, at 55.  In an attempt to distinguish its patent from Lotus Notes, Visto argued

that "even assuming systems were supporting multiple versions of Notes . . . a replication

between a 3.0 Notes server and a 4.0 Notes server would not be considered a translation between different document formats . . . because such a replication would address relatively minor differences in network or disk storage formats, but not substantive translations between document formats." *Id.* at 57.

The doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of a claim only where the disavowal is unequivocal and unambiguous. *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). The prosecution history at issue here does include such a disclaimer, but it is not the one that Defendants identify. In the response cited by Defendants, the patent holder "set[s] forth a clear disavowal of the claim scope on the record" specifying that that "the translation feature . . . works to convey data between different formats;" that is, "that requires that the first format and second format be different." *Defs.' Opening Br.* Ex. E, at 55. Plaintiff recognizes this with its alternative proposed construction: "information or data in a format that is different from the first format."

The patentee's statement regarding the *type and degree* of differences necessary to constitute translation between formats is not sufficiently unambiguous to limit the claim scope. The patentee argued that Lotus Notes "replication" did not amount to "translation between document formats" because the replication addressed "relatively minor differences in network or disk storage formats, but not substantive translations between document formats." What remains ambiguous is how, precisely, the "document format" of Lotus Notes relates to the workspace element formats described in the '708 patent. The parties agree that a workspace element is "a subset of workspace data such as an email, file, bookmark, calendar, or applications program which may include version information." But it remains unclear whether any or all of the data types constituting workspace elements are "documents," as defined in the patentee's disclaimer.

Accordingly, the Court cannot conclude that the patentee unequivocally narrowed the scope of the claim such that two different workspace elements are in different formats only if their differences exceed "minor differences in network or disk storage format."  Instead, the only limitation clearly embraced in the prosecution, and therefore applied in this construction, is that the first and second formats be different.

### 9.    "normally open LAN firewall port" – '679: 1

Court's Construction: *"a port that is typically open for communication in a firewall"*

Evidence and Authority:  This construction originates from the first phrase in Defendants' proposed construction, and was agreed to by Plaintiff at the *Markman* hearing.  Because Plaintiff agreed to the construction, the Court does not address the propriety of an interpretation that explicitly references Ports 80 and 443 as examples of normally open ports.

Defendants' proposed qualification of the construction—that the port need not "be specifically opened to allow remote connections"—is unwarranted.  The prosecution history upon which Defendants rely to support this proposal does not constitute a clear disavowal of a broader claim scope, and does not justify the addition of the proposed limitation.

### 10.  "HTTP port and/or SSL port" – '192:10

Court's Construction: *"any port that is used to transfer information or communicate using Hyper Text Transfer Protocol (HTTP) and any port that is used to transfer information or communicate using Secure Sockets Layer (SSL) protocol"*

Evidence and Authority: The issue in dispute is whether HTTP or SSL ports are limited to the specific port numbers typically configured for those protocols—port numbers 443 and 80, respectively—or whether any port using the relevant protocol qualifies.  Defendants contend the construction which the Court here adopts improperly broadens the claim because it defines the

ports by virtue of the information passing through them, rather than by their own characteristics. By analogy, Defendants argue that a street does not become a horse track simply because you ride a horse on it.  According to Defendants, a person of ordinary skill in the art would understand the HTTP port to be the specifically designated port number 80, and the SSL port to correspond with port number 443.  Visto affirmatively embraced this more limited interpretation, Defendants contend, during the patent prosecution.

In response to a PTO denial, Visto distinguished prior art, Lotus Notes, on the grounds that Lotus Notes required the system to identify, configure, and specifically open a dedicated port—port 1352—in order to allow remote connections to the server.  *Defs.' Opening App.*, Ex. 3B at 21 ('192 Reexam. FH 11/07/2007 Response).  In contrast, Plaintiff contended in reexamination that claim 10 of the '192 patent recited a "hypertext transfer protocol (HTTP) port and secure socket layer (SSL) port for communicating through a firewall" by "allow[ing] the connection to be set up via ports used by convention for HTTP connections (i.e. ports 80 and 443)."  *Id.*  Although this statement strongly suggests that the patentee expected the communications channel to run through ports 80 and 443, it does not constitute a clear and unequivocal disavowal of a broader scope.  The patentee merely stated that the invention *allowed* connection through ports 80 and 443, not that it required using those ports.

The more permissive interpretation finds further support in the specification, which describes a communications module capable of establishing a communication channel through the firewall by "applying Secure Socket Layer (SSL) technology."  '221 col.5 ll.4–8.  That the SSL port can be established by the communications module suggests that the port need not be predefined, and that it could be any port that uses SSL protocol.  Accordingly, the Court embraces the more permissive construction adopted by Judge Ward in *Seven II* and *Smartner*,

and by Magistrate Judge Everingham in *RIM*.

**11. "after a user has finished using the data"** – '606: 21 / **"after an indication is provided that the user has finished using the data"** – '606: 25

<u>Court's Construction</u>: *no construction*

<u>Evidence Authority</u>: Claim 21 describes a medium for storing computer code to do the following: download data from a remote site, place the data in temporary storage on the untrusted client site, enable manipulation of that data, enable a request to manipulate the downloaded data, and then "automatically disable[e] the untrusted client site from accessing at least a portion of the downloaded data *after a user has finished using the data* in a trusted manner." '606 col.2 ll.45–64 (emphasis added). Defendants urge a construction that mandates a causal relationship between an indication that the user has finished using the data and the automatic disabling. They argue that the disabling must occur "*in response*" to an indication that the user has finished using the data, not simply at any point in time after the user has finished using the data. The Court concludes the plain meaning of the claims is sufficiently clear without construction, as did Magistrate Judge Everingham in *Good* and *RIM*, and refuses to impose restrictions from the description of the preferred embodiments onto the claim language. *See Good*, slip op. at 17; *RIM*, slip op. at 12.

**12. "store"** – ''708: 52, 56; '192: 10, 22

<u>Court's Construction</u>: *"a storage location for data"*

<u>Evidence and Authority</u>: The Court adopts a limited version of the construction espoused by Judge Ward in *Seven*. In *Seven*, the defendants advanced an interpretation that would "particularize the location of the stores as well as the type of memory that can serve as a store." *Seven*, slip op. at 24. Judge Ward did not find such limitations warranted, and thus clarified that a "storage location for data . . . may reside on *any type of memory device*." *Id.* (emphasis added).

Defendants in this case make no argument to limit where a store is located, and Plaintiff makes no argument to expand it. Thus, the Court declines to insert a qualifying phrase—data that may reside on any type of memory device—which arguably expands the meaning beyond what is expressly provided in the claim.

**13. "version information"** – '192: 10, 22; '679: 1

<u>Court's construction</u>: *"information that can be used to determine the version of the workspace element"*

<u>Evidence and Authority</u>: The Court adopts Plaintiff's proposed construction, which was first promulgated by Judge Ward in *Seven*, slip op. at 26, and later accepted by Magistrate Judge Everingham in *Good*, slip op. at 11, and *RIM*, slip op. at 11–12. Defendants claim that this construction improperly broadens the term to cover data that "can be used, indirectly, to determine a version." *Defs.' Resp.* 19. The concern, presumably, is that the "version information" could have other functions, in addition to identifying the version of the workspace element. But Defendants' alternative construction—"information that indicates the version of the workspace element"—is susceptible to the same interpretation. Ultimately, the Court concludes that the adopted construction clarifies the term without improperly broadening its meaning, and is therefore preferable to no construction at all.

**14. "preferred version"** – '192: 10, 22

<u>Court's Construction</u>: *no construction*

<u>Evidence and Authority</u>: The meaning is readily apparent from the language of the asserted claims. *See U.S. Surgical Corp. v. Ethicon, Inc*., 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction . . . is not an obligatory exercise in redundancy.").

**15. "differences"** – '221: 15, 16; '679: 1

<u>Court's Construction</u>: *no construction*

<u>Evidence and Authority</u>:  The meaning is readily apparent from the language of the asserted

claims.  *See U.S. Surgical Corp.*, 103 F.3d at 1568 ("Claim construction . . .  is not an obligatory

exercise in redundancy.").

**16.  "interface preferences" / "interface preferences of a predetermined user"** –
'221: 15

<u>Court's Construction</u>: *no construction*

<u>Evidence and Authority</u>: Defendants urge two limitations: (1) that the interface preferences

"must govern the appearance of the user interface on the smart phone," and (2) "that the interface

preferences must be stored at the global server."  Neither restriction is warranted.

Nothing in the claim language indicates that the interface preferences pertain exclusively

to the appearance of the interface.  Defendants note that the description of the preferred

embodiment refers to "predetermined user preferences, *such as* font size, window size, text size,

etc.," all of which relate to the appearance of the interface.  '221 col.8 ll.55–56 (emphasis

added).  However, during the prosecution history, an examiner observed that the above examples

were the only recitations of user preferences described in the embodiment.  '221 Reexam.,

8/21/2008 Office Action, at 10.  Features of the preferred embodiments do not necessarily limit

the claim scope.  Furthermore, these design-related features are explicitly listed in the

embodiment as mere examples of user preferences.  Thus, the design restriction fails.

Nor does the claim dictate where the interface preferences must be stored.  Claim 15 of

the '221 patent describes a method for "receiving the interface preferences . . . from the global

server."  '221 C1 col.1 ll.32–33.  It does not follow that the interface preferences must be stored

there.  Indeed, where the invention requires that information be stored at the global server, it

makes that requirement explicit. '221 C1 col.1 l.29 (describing a method that "store[s] the differences at a global server").

**17. "service request" / "a service request from the global server"** – '221: 16

Court's Construction: *no construction*

Evidence and Authority:  Claim 16 of the '21 patent describes a system for accessing a service server inside the LAN that includes "sending, from a second device, a user request to the global server; and receiving, at the service server, a service request from the global server, the service request corresponding to the user request sent from the second device to the global server." '221 C1 col.1 ll.47–54.  Defendants propose a construction that would require the service request sent from the global server to the service server to originate at, or be "generated by," the global server.  In other words, according to Defendants, the global server must do more than merely re-direct the service request originating at the second device; it must generate its own service request to the service server.  This restriction is unsupported by the claim language or the specifications.

The claim language itself requires simply that the service request to the service server come "from" the global server and that it "correspond[]" to the service request from the second device to the global server.  This does not preclude an embodiment in which the global server is a conduit that re-routes the service request from the second device.

Neither do the specifications justify imposing the requested limitation.  The specifications describe at least three ways in which the user can access the service server through the global server.  '221 col.13 ll.1–4.  In one of those methods, the global server provides the user with "direct access" to the service server.  *Id.*  This method is dubbed the "redirect" method in Figure 12, and appears to embody precisely the re-routing approach that Defendants seek to write out of

claim 16.

According to Defendants, this option is unavailable when, as is the case in claim 16, the service server is behind a firewall.  But the specification language is not so direct.  After explaining that there are three ways to initiate service with the service server, the patent provides:

> For example, if the user selects a service **615** on a service server (e.g., the client **165**) that is not protected by a separate firewall, then the global server **115** may provide the user with direct access.  If the user selects a service **615** provided by a service server within a LAN **125**, then the global server **115** may access the service **615** as a proxy for the user.

'221 col.13 ll.4–10.  As shown, the specification merely provides "example[s]" of when the global server "may" use each method of accessing the service server.

Furthermore, Defendants have not shown that a person of ordinary skill in the art would understand the "proxy" method to require a second service request "generated" by the global server.  Indeed, the patent teaches that "[a]s a proxy, the global server **115** forwards the service request to the selected service **615**."  '221 col.14 ll.13–14.  Thus, it appears that within the context of the patent, the global server's role as a proxy can be limited to simply forwarding service requests, not generating them on its own.

This interpretation of proxy finds additional support in a technical dictionary published near the time the patent was issued.  It defines a "proxy server" as an "application that breaks the connection between sender and receiver" by "forward[ing]" incoming communications "out a different port."  *Pl.'s Resp. Br.* 32 (citing MCGRAW HILL COMPUTER DESKTOP ENCYCLOPEDIA, 9th ed. (2001)).  This definition reinforces the proposition that a person of ordinary skill in the art would have understood even the proxy method to allow an embodiment in which the global server merely forwards the service request.  Based on all the evidence before it, the Court cannot conclude that either the claims or specifications support a construction that requires the global

server to generate the service requests sent to the service server.

### 18. **"initiating"** – '192: 10

Court's Construction: *no construction*

Evidence and Authority:  The meaning is readily apparent from the language of the asserted

claims.  *See U.S. Surgical Corp.*, 103 F.3d at 1568 ("Claim construction . . .  is not an obligatory

exercise in redundancy.").

### 19. **"when predetermined criteria have been satisfied"** – '192: 10, 22

Court's Construction: *no construction*

Evidence and Authority:  Defendants urge the Court to adopt a construction that mandates a

causal relationship between the satisfaction of the criteria and the initiation of the general

synchronization module—"as a result of a predetermined criteria being satisfied."  Although the

Summary of the Invention and other parts of the specification suggest that the satisfaction of

predetermined criteria controls the initiation of the general synchronization module, the claims

themselves include no such limitation.  The principal tool for interpreting claim scope is the

language of the claim.  *See Phillips*, 415 F.3d at 1312.  Nothing about the phrase in question here

suggests it would not be understood by a person of ordinary skill in the art.  Thus, finding the

claim language sufficiently clear, the Court declines to construe it.  *See U.S. Surgical Corp.*, 103

F.3d at 1568

### 20. **Limiting effect of preambles to claims 15 and 16 of the '221 patent**

Court's Construction: the preambles limit claims 15 and 16 of the '221 patent

Evidence and Authority:  The preambles to claims 15 and 16 recite a "method for synchronizing

workspace data."  Defendants contend the preambles limit the claims.  Plaintiff disagrees.

Generally, preambles limit claims only when "necessary to give life, meaning, and

vitality to the claim based on the facts of the case at hand and in view of the claim as a whole."
*August Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1284 (Fed. Cir. 2011) (internal citations omitted)).  However, "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention."  *Invitrogen Corp. v. Biocrest Mfg.*, L.P., 327 F.3d 1364 (Fed. Cir. 2003).

In *Invitrogen*, the patentee altered the preamble of a claim—from "competent E. Coli cells" to "E. Coli cells of improved confidence"—in an attempt to overcome the PTO's initial rejection.  *Id.* at 1370.  The patentee made the amendment to "make clear that the [claimed] process gives E. Coli cells of improved competence" and to distinguish prior art that did "not teach the preparation of E. Coli cells of improved competence."  *Id.*  The district court concluded, and the Federal Circuit agreed, that the preamble limitation was "clearly essential for procuring the patent," and that the patentee could not later "disavow" it.  *Id.*

Like the patentee in *Invitrogen*, Visto relied on the preambles to distinguish the claims over prior art, thereby converting the preamble into a claim limitation.  During the prosecution of the '221 patent,  the PTO rejected the original claims that evolved into claims 15 and 16, because they did "not recite any synchronization features," and were therefore anticipated by a piece of prior art, Salesky.  *Defs.' Opening App.*, Ex. 4B ('221 File History, 8/23/2002 Interview Summary).  In response, Visto amended the claims to add "synchronizing workspace data" to the preamble.  According to Visto, the claims, "particularly as amended," clearly distinguished over Salesky, because they "were drawn to synchronization of the workspace data."  *Id.*, Ex. 4C ('221 File History 12/30/2002 Response at 7).  Visto relied on the preamble to procure the patent, and it cannot now disavow the synchronization limitation.

That Visto may have believed the claim clearly recited synchronization even without the amendment does not undermine the Court's conclusion.  In *Invitrogen*, the patentee amended its claims simply to "make clear" what it presumably believed was already expressed in the original claims.  327 F.3d at 1370.  That did not dissuade the court from concluding that the patentee had relied on the preamble term to distinguish prior art and thus transformed the preamble into a claim limitation.  Nor does the PTO's initial reaction to the amendment dictate a contrary response.  Although the PTO did not find the addition of the preamble sufficient to distinguish Salesky, this does not change the fact that Visto relied on the preamble to do so in its response, and maintained the preamble from that point forward.

**21. "Internet"** – '192: 22; '679: 1

Agreed Construction: *no construction*

**22. "independently modifiable copy"** – '192: 10, 22; '708: 52, 56, 89

Agreed Construction: *"a copy of a workspace element capable of being modified independent of the workspace element.  The copy of the workspace element does not have to be in the same format as the workspace element"*

**23. "independently modifiable email"** – '679: 1

Agreed Construction: *"emails that are capable of being modified independent of each other. The emails cannot be unrelated and do not have do not have to be in the same format"*

**24.  "workspace element"** – '708: 52, 56, 89; '192: 10, 22

Agreed Construction: *"a subset of workspace data such as an email, file, bookmark, calendar, or applications program which may include version information"*

**25. "smart phone"** – '708: 89; '192: 10, 22; '221: 15; '606: 21; '679: 1

Agreed Construction: *"a subset of workspace data such as an email, file, bookmark, calendar, or applications program which may include version information"*

**26. "workspace data" / "first workspace data" / "second workspace data"** – '221:15, 16; '606: 21, 25

Agreed Construction: *"data, including corresponding version information, which may include e-mail data, file data, calendar data, user data, etc. Workspace data may also include other types of data such as applications programs"*

**27. "workspace data manager"** – '606: 21, 25

Agreed Construction: *"a program that allows a user to manipulate workspace data"*

**28. "untrusted client site"** – '606: 21, 25

Agreed Construction: *"a computer that is outside the firewall which is accessible to unprivileged users"*

**29. "automatically disabling the untrusted client site from accessing at least a portion of the downloaded data" / "automatically disable the untrusted client site from accessing at least a portion of the downloaded data"** – '606: 21, 25

Agreed Construction: *"preventing, without a user request to do so, the untrusted client site from accessing at least a portion of the downloaded data after a user has finished using the data"*

The claim constructions at pages seven through thirty-six of this Opinion shall govern the case going forward.

**SO ORDERED**.

August 11, 2013.

BARBARA M. G. LYNN
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**